IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |  | |
|---|---|---|---|
| IP INVESTMENTS, LLC, | § | | |
| | § | | |
| Plaintiff, | § | | |
| | § | | |
| VS. | § | CIVIL ACTION NO. H-13-629 | |
| | § | | |
| VELSICOL CHEMICAL, LLC, *et al.*, | § | | |
| | § | | |
| Defendants. | § | | |

**MEMORANDUM AND ORDER**

The plaintiff, IP Investments, LLC, sued the defendant, Velsicol Chemical, LLC, asserting claims under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601–75, and its Texas analogue, the Texas Solid Waste Disposal Act (TSWDA), TEX. HEALTH & SAFETY CODE § 361.344, as well as a common-law fraud claim. The claims arise out of contamination at a manufacturing site referred to as the "Bayport Site" located in Harris County, Texas. Velsicol acquired the Bayport Site in 1967 and manufactured pesticides and other chemicals there. Some of these substances were released and caused contamination. IP Investments acquired the Bayport Site in 2009. IP Investments learned that the site was contaminated and in 2010 began remediation work. IP Investments and Velsicol negotiated toward an agreement to share the remediation costs. Velsicol offered at one point to pay $1.5 million toward the cleanup but later reduced its offer to $500,000, citing lower-than-expected profits. IP Investments rejected this offer and ended the negotiations. In this suit, IP Investments alleges that Velsicol never had the ability to pay $1.5 million for remediation and materially misrepresented that it could pay this amount. This alleged misrepresentation is the basis of IP Investments's fraud claim.

Velsicol has moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) and, in the alternative, for summary judgment dismissing the fraud claim. (Docket Entry No. 27). The court instructed the parties to first address Velsicol's pleading challenge. IP Investments responded, (Docket Entry No. 32), and Velsicol replied, (Docket Entry No. 33).

Based on the pleadings, the motion and responses, the parties' submissions and arguments, and the applicable law, the motion for judgment on the pleadings is denied. The reasons are explained below.

**I.     Background[1]**

The Bayport Site is a 50-acre manufacturing site in Pasadena, Harris County, Texas. After Velsicol acquired the site in 1967, it manufactured pesticides, herbicides, and other chemicals that IP Investments claims are hazardous substances under CERCLA and the TSWDA. (Docket Entry No. 1 at ¶¶ 20, 46, 52). IP Investments alleged that Velsicol knew during the time it owned the Bayport Site that chemicals it produced were contaminating the site. (*Id.* at ¶ 21).

In April 2001, Velsicol placed the "Main Plant" part of the site into a "Voluntary Clean-Up Program" that the Texas Commission on Environmental Quality administered. (*Id.* at ¶ 22). In January 2002, Velsicol reported the site's contamination to its insurance carrier, Chartis Specialty Insurance Company. (*Id.* at ¶ 24). In February 2002, Velsicol placed the "Northern Undeveloped Tract" part of the Bayport Site in the same Voluntary Clean-Up Program. (*Id.* at ¶ 23).

In 2004, Velsicol sold the Bayport Site to the Galveston Company. (*Id.* at ¶ 27). On July 2, 2009, IP Investments purchased the site from the Galveston Company in bankruptcy proceedings.

---

[1] Because the defendants have moved to dismiss under Federal Rule of Civil Procedure 12(c), this court accepts as true the complaint's factual allegations. *See Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2079 (2011).

(*Id.* at ¶ 28). In November 2009, Chartis Insurance stated that it would not cover the site remediation costs. (*Id.* at ¶ 25).

In 2010, Velsicol and IP Investments entered into a cost-sharing agreement in which they would together fund a report identifying the source and scope of the contamination and recommending a remediation plan. (*Id.* at ¶ 30). IP Investments agreed to amend the Voluntary Clean-Up Program to add Velsicol as a "co-applicant." (*Id.* at ¶ 32).

In January 2012, IP Investments and Velsicol began negotiating a "Cost Sharing Settlement and Indemnification Agreement" to allocate remediation costs at the Bayport Site. (*Id.* at ¶ 34). The negotiations were robust, with multiple offers and counteroffers. On July 18, 2012, Velsicol offered to contribute $1.5 million to remediate the "middle pond" and pay 75% of the costs of groundwater monitoring for 10 years. (*Id.* at ¶ 35; Docket Entry No. 27, Ex. 1 at 3). Velsicol's offer called for IP Investments to pay the remaining costs or indemnify Velsicol for costs it incurred over $1.5 million. (Docket Entry No. 27, Ex. 1 at 3). IP Investments rejected Velsicol's offer, stating that it would not consent to a cost-sharing agreement that capped Velsicol's exposure at $1.5 million. (*Id.*, Ex. 2 at 2). IP Investments counteroffered, making a proposal without this cap. (*See* Docket Entry No. 1 at ¶ 39, Docket Entry No. 27, Ex. 6).

IP Investments told Velsicol that the parties needed to reach an agreement quickly because contractor bids for remediating the site were increasing. As early as July 17, 2012, IP Investments stated that "time is of the essence." (Docket Entry No. 27, Ex. 1 at 4). IP Investments emphasized that "[o]ur contractors and vendors cannot hold the prices representing the lower cost opportunity beyond July 26." (*Id.*). On October 23, 2012, IP Investments stated that the failure to reach an

3

agreement had resulted in a "healthy [price] increase" in the bids, which would continue to increase "as demand for good contractors . . . is currently exceeding supply." (*Id.*, Ex. 6 at 1).

On November 2, 2012, Velsicol submitted a revised settlement proposal reducing its offer to $500,000. (Docket Entry No. 1 at ¶ 64; Docket Entry No. 27, Ex. 7 at 2). It explained that its profits had been lower than expected and that money it had earmarked for remediating the Bayport Site was needed for other parts of its business. (Docket Entry No. 27, Ex. 7 at 2–3). IP Investments responded by accusing Velsicol of negotiating in bad faith and threatening suit. (*Id.*, Ex. 7 at 1–2).

IP Investments filed this suit on March 8, 2013, asserting claims under CERCLA and the TSWA (Counts 1 and 2), and a fraud claim (Count 3). (Docket Entry No. 1). The CERCLA and TSWA claims seek to recover the costs of remediating the Bayport Site and a declaratory judgment entitling IP Investments to future clean-up costs. IP Investments seeks damages for the fraud claim.

Velsicol moved for judgment on the pleadings dismissing the fraud claim, or alternatively, asking the court to convert the motion to one for summary judgment.[2] (Docket Entry No. 27). On August 27, 2013, this court directed the parties to address first Velsicol's motion for judgment on the pleadings, ruling that if converting it to a motion for summary judgment was necessary, the motion would not be decided until after the parties had the opportunity to conduct discovery. (Docket Entry No. 31).

The arguments and responses are analyzed below.

---

[2] The parties cross-moved for summary judgment on the CERCLA claim. (Docket Entry Nos. 34, 35). The court will address those motions in a separate order.

**II.     Legal Standard for Judgment on the Pleadings**

"A motion brought pursuant to Federal Rule of Civil Procedure 12(c) is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002). The Rule 12(c) standard is the same as that under Rule 12(b)(6). *Gentilello v. Rege*, 627 F.3d 540, 543–44 (5th Cir. 2010). Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see also Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008). The Supreme Court explained that "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 677.

When deciding a motion for judgment on the pleadings, the court considers the pleadings. *Brittan Commc'ns Int' Corp. v. Sw. Bell Tel. Co.*, 313 F.3d 899, 904 (5th Cir. 2002). The Fifth Circuit has consistently held that "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *See, e.g.*, *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004); *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007); *Collins v. Morgan Stanley*

*Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000); *see also* 5B Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1357, at 509–10 (3d ed. 2004) (stating that "matters incorporated by reference or integral to the claim [and] items appearing in the record of the case . . . may be considered by the district judge without converting the [Rule 12(b)(6)] motion into one for summary judgment"). A court's consideration of the attached documents is appropriate because "the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated." *Causey*, 394 F.3d at 288. Because the standards for Rule 12(c) and Rule 12(b)(6) are the same, a court may consider the same kinds of documents in a Rule 12(c) motion that it could consider in a Rule 12(b)(6) motion.

**III.   Analysis**

    **A.   Consideration of Email Correspondences Velsicol Attached to its Motion for Judgment on the Pleadings**

The threshold issue is whether the court may consider email settlement communications between IP Investments and Velsicol in the Rule 12(c) analysis. Velsicol attached these emails, dated between July and November 2012, to its motion. (*See* Docket Entry No. 27, Exs. 1–7). IP Investments argues that consideration of "most" of these emails—those emails that the complaint does not expressly cite or quote—would require the court to convert the Rule 12(c) motion into a Rule 56 motion for summary judgment.

The emails Velsicol attached to its Rule 12(c) motion were central to the fraud claim and were referenced in the complaint. The complaint alleged that IP Investments and Velsicol engaged in negotiations from January through November 2012 over the terms of the proposed Cost Sharing Settlement and Indemnification Agreement. (Docket Entry No. 1 at ¶¶ 34–40). The emails Velsicol attached to its Rule 12(c) motion were part of the negotiations alleged in the complaint. The

complaint also alleged that Velsicol's offer to pay $1.5 million toward remediating the Bayport Site and that IP Investments relied on this representation. (*Id.* at ¶ 64). This offer was memorialized in one of the attached emails. (Docket Entry No. 27, Ex. 1 at 3). The complaint further alleged that IP Investments repeatedly informed Velsicol that "time was of the essence." (Docket Entry No. 1 at ¶ 38). These warnings were in emails that Velsicol attached to its motion. (Docket Entry No. 27, Ex. 1 at 4). The complaint also refers to a November 2012 email from Velsicol informing IP Investments that Velsicol was no longer able to contribute $1.5 million to the remediation. (Docket Entry No. 27, Ex. 7 at 2–3).

IP Investments does not dispute that the factual allegations supporting the fraud claim are contained or memorialized in the emails Velsicol attached to its Rule 12(c) motion. Instead, IP Investments argues that this court may not consider for Rule 12(c) purposes the emails that the complaint did not specifically refer to, quote, or cite. IP Investments contends that a complaint "references" an email only if the complaint refers to, quotes, or cites that specific email. (Docket Entry No. 32 at 3–7).

IP Investments has cited no case holding that a complaint must refer to documents that are attached to a Rule 12(c) motion with such specificity. Black's Law Dictionary (6th ed. 1990), defines "refer" as "to point, allude, direct, or make reference to . . . for purposes of directing the reader's attention to another place in the . . . document." IP Investments's complaint did just that. By alleging that negotiations over the Cost Sharing and Settlement Agreement took place between January and November 2012, and that the negotiations were conducted in part through and memorialized in emails, the complaint pointed to, and alluded to, the emails that Velsicol submitted.

7

The emails are properly considered in ruling on Velsicol's Rule 12(c) motion without converting it to one for summary judgment.

### B. The Fraud Claim

The elements of fraud under Texas law are "(1) a [material] misrepresentation that (2) the speaker knew to be false or made recklessly (3) with the intention to induce the plaintiff's reliance, followed by (4) actual and justifiable reliance (5) causing injury." *Rio Grande Royalty Co., Inc. v. Energy Transfer Partners, L.P.*, 620 F.3d 465, 468 (5th Cir. 2010) (citing *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001)). To plead fraud sufficiently under Rule 9(b), the plaintiff must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. WMX Technologies, Inc*., 112 F.3d 175, 177 (5th Cir. 1997). Velsicol contends that it is entitled to judgment on the pleadings because IP Investments has not alleged an actionable misrepresentation and because any reliance was unjustified as a matter of law.[3] Both arguments are addressed below.

Velsicol argues that IP Investments has not alleged an actionable misrepresentation. Velsicol argues that the allegedly fraudulent statements were its opinions, not statements of fact. "Pure expressions of opinion are not representations of material fact, and thus cannot provide a basis for a fraud claim." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337-38 (Tex. 2011). "[A] statement of fact is one that (1) admits of being adjudged true or false in

---

[3] Velsicol does not argue in its motion for judgment on the pleadings that alleged misrepresentations were material or that IP Investments relied on them. (*See* Docket Entry No. 27 at 5–6).

a way that (2) admits of empirical verification." *Presidio Enterprises, Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 679 (5th Cir. 1986).

IP Investments has sufficiently alleged a factual misrepresentation. The basis of the fraud claim is Velsicol's offer to pay $1.5 million toward remediating the site. Velsicol made this offer in a July 18, 2012 email, stating that "Velsicol will increase our maximum contribution on the middle pond to 75% of the total costs of the project up to a maximum of $1.5 million." (Docket Entry No. 1 at ¶ 62; *see also* Docket Entry No. 27, Ex. 1 at 3). When Velsicol offered to fund $1.5 million of the remediation costs, it represented it could and would contribute up to that amount. The representation is capable of empirical verification by looking at Velsicol's financial statements and outstanding obligations to see if Velsicol could make the payment as offered. *See Presidio Enterprises*, 784 F.2d at 679. Velsicol's offer to pay $1.5 million was a factual statement and not merely a statement of opinion. IP Investments has alleged an actionable misrepresentation.

Velsicol also argues that IP Investments's reliance on Velsicol's statements during negotiations was unjustified as a matter of law. Velsicol cites to cases stating that, "[g]enerally reliance on representations made in a business or commercial transaction is not justified when the misrepresentation is made in an adversarial context, such as litigation." *Ortiz v. Collins*, 203 S.W.3d 414, 422 (Tex. App.—Houston [14th Dist.] 2006, no pet.); *Coastal Bank SSB v. Chase Bank of Texas, N.A.*, 135 S.W.3d 840, 843 (Tex. App—Houston [1st Dist.] 2003, pet. denied). The Texas Supreme Court explained this general rule in *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787 (Tex. 1999). *McCamish* involved an alleged misrepresentation an attorney made to an adverse party. *Id.* at 788–89. The adverse party sued the attorney for fraud. The court held that the adverse party's reliance on the attorney's statements was unjustified,

reasoning that a client hires an attorney to protect the client's interests. *Id.* at 791–94. The attorney's duty to represent his client zealously could be compromised if the attorney, notwithstanding ethical responsibilities, could be liable for misrepresentation based on statements to an adverse party. *See id.* The court noted that the rule is not limited to statements made during litigation and can apply to adversarial business transactions. *Id.* at 794. Whether misrepresentations are made in an adversarial context is a fact-specific inquiry that "should be guided . . . by the extent to which the interests of the [parties] are consistent with each other. *Id.* (internal quotations omitted).

Velsicol has not shown that its alleged misrepresentations occurred in an adversarial context so as to make IP Investments's reliance unjustifiable as a matter of law. When the alleged misrepresentations were made, the parties were not involved in litigation with each other. Instead, they were working to reach an agreement for sharing the costs of remediating the Bayport Site. Further evidence of cooperation between the parties is their agreement in 2010 to jointly fund a report identifying the source and scope of the site's contamination and recommending ways to remediate it. (Docket Entry No. 1 at ¶ 30). IP Investments amended the Voluntary Clean-Up Program to add Velsicol as a "co-applicant." (*Id.* at ¶ 32).

Both sides appreciated that future litigation between the parties was possible. But before Velsicol offered $1.5 million on January 18, 2012, the reference to litigation was Velsicol's statement that it would withdraw its demand and "pursue alternatives" if Velsicol did not agree to contribute more money than it had. (Docket Entry No. 27, Ex. 1 at 4). In light of the evidence of cooperation between the parties, the fact that IP Investments stated an intent to "pursue alternatives"

if Velsicol did not increase its offer is insufficient to make the parties' relationship adversarial so as to make reliance on the offer unjustifiable as a matter of law.

A recent opinion from a court in this district concluded that even if statements were made in an adversarial context, that need not lead to the conclusion that there can be no justifiable reliance on the statements. In *ED&F Man Biofuels Ltd. v. MV Fase*, 728 F. Supp. 2d 862 (S.D. Tex. 2010), the court analyzed *Ortiz v. Collins*; *Coastal Bank SSB v. Chase Bank of Texas, N.A.*; and *McCamish*. The court stated that "another factor" besides an adversarial context is needed before a court can hold that reliance was unjustified as a matter of law. *ED&F Man Biofuels*, 728 F. Supp. 2d at 882. The additional factor tends to be "[1] an express contract whose contrary terms were ignored by the person claiming justifiable reliance or [2] an attorney making the misrepresentations, or [3] some kind of appearance of finality in an agreement." *Id.* None of these factors apply here.

Velsicol argues briefly that there can be no justifiable reliance when an offer containing a misrepresentation is rejected. The case it cites for this argument, *TCA Building Co. v. Entech, Inc.*, 86 S.W.3d 667, 675 (Tex. App.—Austin 2002, no pet.), does not make the argument persuasive. Whether an offer is ultimately rejected is not dispositive of whether the offeree was justified in relying on misrepresentations contained in the offer. Whether the offer was ultimately rejected may be relevant to whether there was in fact reliance on the misrepresentations and whether there was injury. But Velsicol did not raise these issues in its Rule 12(c) motion.

Velsicol has not shown, as a matter of law, that IP Investments's reliance on the alleged misrepresentations was unjustified. The motion for judgment on the pleadings is denied. This ruling is without prejudice to Velsicol's ability to urge that the summary-judgment record entitles it to a ruling that there is no basis for recovery for the fraud alleged.

## IV.     Conclusion

Velsicol's motion for judgment on the pleadings, (Docket Entry No. 27), is denied. A status conference is set for **March 24, 2014, at 4:00 p.m.**

SIGNED on March 13, 2014, at Houston, Texas.

Lee H. Rosenthal
United States District Judge